*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

|  |  |
|---|---|
| No. 07-2469<br>MICHIGAN BELL TELEPHONE COMPANY,<br><div align="right">*Plaintiff-Appellee,*</div><br>*v.*<br><br>COVAD COMMUNICATIONS COMPANY, et al.,<br><div align="right">*Intervenors Defendants-Appellants,*</div><br>MCLEODUSA TELECOMMUNICATIONS<br>SERVICES, INC., et al.,<br><div align="right">*Intervenors,*</div><br>J. PETER LARK, Commissioner, et al.,<br><div align="right">*Defendants.*</div><br><br>No. 07-2473<br>MICHIGAN BELL TELEPHONE COMPANY,<br><div align="right">*Plaintiff-Appellee,*</div><br>*v.*<br><br>LAURA CHAPPELLE, et al.,<br><div align="right">*Defendants-Appellants*,</div><br>COVAD COMMUNICATIONS COMPANY, et al.,<br><div align="right">*Intervenors.*</div> | Nos. 07-2469/2473 |

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-11982—Julian A. Cook, Jr., District Judge.

Argued: December 10, 2008

Decided and Filed: February 23, 2010

Before: BATCHELDER, Chief Judge; GILMAN and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Bill Magness, CASEY, GENTZ & MAGNESS, L.L.P., Austin, Texas, Michael A. Nickerson, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants.  William Julius Champion III, DICKINSON WRIGHT PLLC, Ann Arbor, Michigan, for Appellee.  Scott H. Angstreich, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC, Washington, D.C., for Amici Curiae. **ON BRIEF:** Bill Magness, CASEY, GENTZ & MAGNESS, L.L.P., Austin, Texas, Steven D. Hughey, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Michael S. Ashton, FRASER, TREBILCOCK, DAVIS & DUNLAP, P.C., Lansing, Michigan, Steven D. Hughey, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants.  William Julius Champion III, Jeffery V. Stuckey, DICKINSON WRIGHT PLLC, Ann Arbor, Michigan, for Appellee.  Scott H. Angstreich, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC, Washington, D.C., Laurel R. Bergold, P. Michele Ellison, Richard K. Welch, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Amici Curiae.

BATCHELDER, C.J., delivered the opinion of the court, in which GILMAN, J., joined.  SUTTON, J. (pp. 23-31), delivered a separate dissenting opinion.

_____

**OPINION**
_____

ALICE M. BATCHELDER, Chief Judge.  A state telephone-utility commission and several competitive local exchange carriers appeal a judgment in which the district court vacated the commission's order requiring the incumbent local exchange carrier to provide certain "entrance facilities" at wholesale prices.  Finding the appellants' arguments unpersuasive, we AFFIRM.

**I.**

Congress enacted the Telecommunications Act of 1996, 47 U.S.C. § 152 *et seq.*, to mandate "that local service, which was previously operated as a monopoly overseen by the several states, be opened to competition." *MCI Telecom. Corp. v. Bell Atl.*, 271 F.3d 491, 497 (3d Cir. 2001).  Congress required the incumbent local exchange carriers (ILECs) to cooperate with competitive local exchange carriers (CLECs) to allow the CLECs to enter the market, either by connecting their equipment to the ILEC's existing network or by purchasing or leasing existing network elements and services.  *Id.*  The ILECs and CLECs,

through negotiation or arbitration, enter into "interconnection agreements," which set out the terms, rates, and conditions. *Id.* Congress directed the Federal Communications Commission (FCC) to promulgate implementing regulations, but gave oversight of the interconnection agreements to the state public-utility commissions. *Id.*

In the present case, the ILEC is Michigan Bell; the CLECs are Covad Communications, Talk America, Inc., XO Communications, McLeod USA Telecommunications, and TDS Metrocom; and the state utility commission is the Michigan Public Service Commission (MPSC), for which the individual commissioners were J. Peter Lark, Laura Chappelle, and Monica Martinez. This case concerns the regulation of "entrance facilities," a type of transmission facility that connects a CLEC network with an ILEC network. But, just to be clear, an "entrance facility" is really just a fancy name for a cable or wire used to transport calls from a CLEC switch to an ILEC switch, and this wire can be very short (if the two switches are close together), or it can be very long, stretching for blocks or even miles (if the switches are far apart), depending on the relative locations of the two switches.

As Congress directed, the FCC promulgated regulations regarding interconnection, *see* 47 C.F.R. § 51.1 *et seq.*, and then set about deciding which of the ILEC's network elements must be "unbundled"; that is, which of the ILEC's network elements must be offered for sale or lease to the CLECs at regulated prices or rates.[1] In August 1996, the FCC issued its *Local Competition Order*, 11 FCC Rcd. 15499, 1996 WL 452885 (Aug. 8, 1996), in which it purported to apply the Act's "impairment test"[2] and — finding impairment everywhere — required the ILECs to unbundle *all* of their interoffice-

---

[1] The FCC created a particular set of regulated rates called "Total Element Long Run Incremental Cost" (TELRIC) rates. Thus, "unbundled" means "regulated," which means "at TELRIC rates." *See Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 531 (2002) (citing *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 394 (1999)) ("Bundling is about lease pricing. To provide a network element 'on an unbundled basis' is to lease the element, however described, to a requesting carrier at a stated price specific to that element."); *see also USTA v. FCC* (*USTA II*), 359 F.3d 554, 561-62 (D.C. Cir. 2004) (discussing "unbundling requirements").

[2] The "impairment test" states:

In determining what network elements should be made available [on an unbundled basis, i.e., to the CLECs at TELRIC rates], the [FCC] shall consider, at a minimum, whether . . . the [ILEC's] failure to provide access to such network elements would impair the ability of the [CLEC] to provide the services that it seeks to offer.

47 U.S.C. § 251(d)(2)(B).

transmission facilities (which included entrance facilities). But the Supreme Court vacated that order, finding the FCC's analysis of impairment unjustifiably over-broad, and remanded the issue to the FCC to try again. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999).

Meanwhile, Michigan Bell had begun to provide for the CLECs to connect to its network. In so doing, Michigan Bell added "entrance facilities" (i.e., cables or wires) with which the CLECs could connect, in order to access Michigan Bell's network. Acting pursuant to the FCC's initial directives, Michigan Bell offered its "entrance facilities" to the CLECs at regulated rates.

The FCC, on remand from the *Iowa Utilities Board* decision, again required the ILECs to unbundle *all* of their interoffice transmission facilities (including entrance facilities), once again under an "impairment test" in which it found impairment everywhere. *See UNE Remand Order*, 15 FCC Rcd. 3696, 1999 WL 1008985 (Nov. 5, 1999). But the reviewing court vacated that order as well, finding the FCC's analysis of impairment unjustifiably over-broad, and remanded the issue to the FCC to try a third time. *See USTA v. FCC*, 290 F.3d 415 (D.C. Cir. 2002) ("*USTA I*").

In its third attempt, on remand from the D.C. Circuit, the FCC — among other things — removed "entrance facilities" from its description of the ILEC network and concluded that an impairment test was not even necessary to hold that entrance facilities need not be unbundled. *See Triennial Review Order* (*TRO*), 18 FCC Rcd. 16978, 2003 WL 22175730, ¶ 366 n.1116 (Sept. 17, 2003) ("Our determination here effectively eliminates 'entrance facilities' as UNEs [unbundled network elements] and, therefore, moots the [FCC's pending notice of proposed rule making] insofar as it proposes limitations on obtaining entrance facilities as UNEs."). But the reviewing court vacated the order yet again, finding that the FCC's exclusion of entrance facilities from the impairment analysis was improper and directing that the FCC must conduct an impairment analysis for entrance facilities. *See USTA v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ("*USTA II*").

Consequently, the FCC issued a fourth order, the *Triennial Review Remand Order* (*TRRO*), 20 FCC Rcd. 2533, 2005 WL 289015 (Feb. 4, 2005), in which it reestablished that entrance facilities are a part of the ILEC network, but found that unbundled access was not necessary because the CLECs were not impaired by paying competitive rates for the use of entrance facilities.[3]  At the conclusion of this finding, however, the FCC included the following paragraph:

> **140.** We note in addition that our finding of non-impairment with respect to entrance facilities does not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2) for the transmission and routing of telephone exchange service and exchange access service.  Thus, competitive LECs will have access to these [interconnection] facilities[4] at cost-based rates to the extent that they require them to interconnect with the incumbent LEC's network.

*TRRO*, 20 FCC Rcd. 2533, 2005 WL 289015, ¶ 140 (footnotes omitted).

As mentioned previously, Michigan Bell had provided entrance facilities for some time, and had been charging the CLECs regulated (TELRIC) rates for use of those entrance facilities.  But, in light of the *TRRO*, Michigan Bell decided that it would henceforth charge higher (i.e., competitive) rates for the entrance facilities it was providing.[5]  Thus, Michigan Bell notified the CLECs that it would be changing the "interconnection agreements" to reflect this new pricing scheme.

---

[3]"In fact, the [*USTA II*] court expressed skepticism that incumbent LECs should be required to build entrance facilities under any circumstances." *TRRO*, 20 FCC Rcd. 2533, 2005 WL 289015, ¶ 137 n.383 (citing *USTA v. FCC*, 359 F.3d 554, 586 (D.C. Cir. 2004) ("If (as appears) [entrance facilities] exist exclusively for the convenience of the CLECs, it seems anomalous that CLECs do not themselves provide them . . . .")).

[4]Although it may appear obvious, it bears express mention that, in writing this paragraph, the FCC did not use "interconnection" as a verb, describing the act of interconnecting with the ILEC network. As used in this paragraph, "interconnection" is an adjective, describing a noun (a certain type of facility) and thereby creating a new noun, an "interconnection facility," as something different and distinct from an "entrance facility."  So, when the FCC says "access to these facilities" in the final sentence, we are confident that the FCC is referring to these "*interconnection* facilities" as opposed to those "entrance facilities" from which it has just drawn a distinction.

[5]Michigan Bell continued to provide *interconnection* with its network at regulated (TELRIC) rates, as required by the statute and regulations, and nothing in the record suggests otherwise.  Michigan Bell simply understood the *TRRO* to mean that an "entrance facility" is different from an "interconnection facility," such that, so long as it provides an "interconnection facility" at TELRIC rates, it can also offer an "entrance facility" (i.e., a different apparatus) at competitive rates, should it choose to do so.

The CLECs, none too pleased with this impending price increase, responded by complaining to the MPSC, arguing that (regardless of the other paragraphs in the *TRRO*) paragraph 140 dictates that the CLECs are still entitled to use the entrance facilities at TELRIC rates for purposes of interconnection with the ILEC network. The MPSC agreed and ordered Michigan Bell to continue to provide entrance facilities at TELRIC rates. The parties refer to this as the "September Order."

Michigan Bell appealed to the district court, which agreed with Michigan Bell (i.e., disagreed with the MPSC's interpretation of the *TRRO*) and reversed the September Order, explaining:

> Th[is] [c]ourt agrees with [] Michigan [Bell] and concludes that the September Order[,] which pertains to this issue[,] does not comply with the rules that were adopted by the FCC pursuant to Section 251. It is not reasonable to interpret an explanatory comment, such as the one found in ¶ 140 of the *TRRO*, in a manner that undermines the plain meaning of the rule. The meaning of ¶ 140 must be interpreted in light of the FCC rule, which provides that entrance facilities need not be provided by incumbent carriers to competing carriers on an unbundled basis. The *TRRO* conveys the finding by the FCC that entrance facilities should be offered competitively. A review of the ruling by the MPSC reveals that the September Order does not comply with this directive, and, accordingly, must be set aside.

*Mich. Bell Tel. Co. v. Lark*, No. 06-11982, 2007 WL 2868633, at *7 (E.D. Mich. 2007).

Both the CLECs and the MPSC commissioners appealed the decision to this court, raising one issue for review. In addition, the FCC and Verizon have submitted briefs as *amicus curiae*.

## II.

"When a district court's decision on summary judgment is the result of a review of a state administrative body's ruling, *de novo* review requires that the proper standard of review of the underlying state administrative ruling be applied." *Quick Commc'ns, Inc. v. Mich. Bell Tel. Co.*, 515 F.3d 581, 584 (6th Cir. 2008). That is, we review *de novo* the question of whether the MPSC's order violated the Telecommunications Act,

but we may overturn the MPSC's findings of fact and state law only if those findings were arbitrary and capricious. *Id.* Because the present case involves no findings of fact or determinations of state law, review in this case is entirely *de novo*.[6]

The key statutory provisions in this case involve "interconnection" and specify that "each incumbent local exchange carrier [i.e., ILEC] has the following duties:"

> (2) Interconnection — The duty to provide, for the facilities and equipment of any requesting telecommunications carrier [i.e., CLEC], interconnection with the local exchange carrier's [i.e., ILEC's] network —
>
> > (A) for the transmission and routing of telephone exchange service and exchange access;
> >
> > (B) at any technically feasible point within the carrier's network;

---

[6] The dissent reviews the present case through the prism of *Auer* deference, through which a federal agency's interpretation of its own ambiguous regulation — even an interpretation presented in an *amicus* brief — is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quotation marks and citations omitted); *Coeur Alaska, Inc. v. Se. Alaska Cons. Council*, 557 U.S. --, 129 S. Ct. 2458, 2470 (2009). The Supreme Court has since added two additional limitations: (1) a "near equivalence of the statute and regulation belies the [applicability of] *Auer* deference," *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006); and (2) an agency cannot "under the guise of interpreting a regulation . . . create *de facto* a new regulation," *Christensen v. Harris County*, 529 U.S. 576, 588 (2000); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 525 (1994) (Thomas, J., dissenting); *Rosales-Garcia v. Holland*, 322 F.3d 386, 403 n.22 (6th Cir. 2003) (*en banc*). And, the Seventh Circuit has expressed some skepticism about the applicability of *Auer* deference to *amicus* briefs at the circuit court level, explaining:

> It is odd to think of agencies as making law by means of statements made in briefs, since agency briefs, at least below the Supreme Court level, normally are not reviewed by the members of the agency itself; and it is odd to think of Congress delegating lawmaking power to unreviewed staff decisions.

*Keys v. Barnhart*, 347 F.3d 990, 993-94 (7th Cir. 2003) (citations omitted).

The dissent relies on the FCC's *amicus* brief to this court (submitted upon our request), in which the FCC offers an interpretation of the *TRRO*, which is itself an "interpretive rule" and not a true "regulation." *See A.D. Transp. Express, Inc. v. United States*, 290 F.3d 761, 768 (6th Cir. 2002) ("An interpretative rule is a rule that clarifies or explains an existing law or regulation."; "[I]nterpretative rules fall within an exception to the [Administrative Procedures] Act and do not require notice and comment."). For these reasons alone, one might legitimately question the applicability of *Auer* deference in this appeal. *See Keys*, 347 F.3d at 993-94; *Coeur*, 129 S. Ct. at 2479 (Scalia, J., concurring) ("*Auer*, however, stands only for the principle that we defer to an agency's interpretation *of its own ambiguous regulation*." (emphasis in original)); *Boose v. Tri-County Metro. Transp. Dist.*, 587 F.3d 997, 1005 (9th Cir. 2009) ("We will not, under the guise of deference, engage in an end-run around notice-and-comment rulemaking.").

But, as will be addressed in the body of this opinion, even ignoring these questions of *Auer*'s applicability, we find *Auer* deference unavailing in this appeal because the FCC's proffered interpretation is so plainly erroneous or inconsistent with the regulation, *see Auer*, 519 U.S. at 461, that we can only conclude that the FCC has attempted to create a new *de facto* regulation under the guise of interpreting the regulation, *see Christensen*, 529 U.S. at 588. We therefore decline the dissent's invitation to apply *Auer* deference to *amici* FCC's position in this appeal.

>  (C)   that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and
>
>  (D)   on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and § 252.[7]

(3) Unbundled access — The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and § 252 of this title.[8]  An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

47 U.S.C. § 251(c).  Thus, § 251(c)(2) requires the ILEC "to provide . . . interconnection with [its] network" to the CLEC (i.e., "for the [CLEC's] facilities and equipment"), whereas § 251(c)(3) requires the ILEC "to provide . . . any requesting [CLEC with] nondiscriminatory access to [i.e., use of] [its] network elements on an unbundled basis."  But the statute further specifies:

> In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the [FCC] shall consider, at a minimum, whether . . . the [ILEC's] failure to provide access to such network elements *would impair the ability* of the [CLEC] to provide the services that it seeks to offer.

---

[7]The pertinent provision of § 252 is the "pricing standards" provision, which states:

Interconnection and network element charges — Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of § 251(c)(2), and the just and reasonable rate for [use of or access to the ILEC's] network elements for purposes of § 251(c)(3) shall be based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable) and nondiscriminatory, and may include a reasonable profit.

47 U.S.C. § 252(d) (statutory citation form altered).  This was the origin of, and now means, TELRIC rates.

[8]See the foregoing footnote.

47 U.S.C. § 251(d)(2)(B) (emphasis added). This is the basis for the "impairment analysis."

The FCC has promulgated implementing regulations, at least two of which are pertinent here, the first being its "interconnection" regulation, which tracks 47 U.S.C. § 251(c)(2) (quoted above):

> An incumbent LEC shall provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the incumbent LEC's network:
>
> > (1) For . . . telephone exchange traffic . . .
> >
> > (2) At any technically feasible point within the [ILEC]'s network . . .
> >
> > (3) That is at a level of quality [used by the ILEC itself] . . .
> >
> > (4) On terms and conditions that are just. . . .

47 C.F.R. § 51.305. The FCC's other pertinent regulation — its counterpart to its "interconnection facility" requirement — is its rule that ILECs are *not obligated* to provide "entrance facilities":

> Entrance facilities. An incumbent LEC [i.e., ILEC] is not obligated to provide a requesting carrier [i.e., CLEC] with unbundled access to dedicated transport that does not connect a pair of incumbent LEC wire centers [i.e., an 'entrance facility'].

47 C.F.R. § 51.319(e)(2)(i). Recall that "[b]undling is about lease pricing," and "[t]o provide a network element 'on an unbundled basis' is to lease the element . . . to a requesting carrier at a stated price [i.e., TELRIC rates] specific to that element." *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 531 (2002). So, this provision could be rewritten as: an ILEC is not obligated to provide entrance facilities at TELRIC rates. Or, stated in positive terms: an ILEC can charge competitive rates for the use of its entrance facilities. The resulting inference is that the ILEC is not obligated to provide an entrance facility at all if it is inconvenient (or unprofitable) to do so. *See*, *e.g.*, *USTA II*, 359 F.3d

at 586 ("If (as appears) [entrance facilities] exist exclusively for the convenience of the CLECs, it seems anomalous that CLECs do not themselves provide them . . . .")).

All of this brings us to the *TRRO*: what it says and what it means. In the part of the *TRRO* that addressed entrance facilities (and its analysis thereof), the FCC stated:

### D.  Entrance Facilities

**136.** In the *Local Competition Order*, the [FCC] defined dedicated transport as:

> incumbent LEC transmission facilities dedicated to a particular customer or carrier that provide telecommunications between wire centers owned by incumbent LECs or requesting telecommunications carriers, or between switches owned by incumbent LECs or requesting telecommunications carriers.

The [FCC] reaffirmed this definition, which encompassed entrance facilities (the transmission facilities that connect competitive LEC networks with incumbent LEC networks), in the *UNE Remand Order*. In the *Triennial Review Order*, we revised the definition of dedicated transport to exclude entrance facilities. We determined that entrance facilities 'exist outside the incumbent LEC's local network' and should therefore — given section 251's focus on competition within the local network — be excluded from the definition of dedicated transport. We also limited the definition of dedicated transport to 'those transmission facilities connecting incumbent LEC switches and wire centers within a LATA.' Reviewing the *Triennial Review Order*, the *USTA II* court indicated that our exclusion of entrance facilities from the definition of dedicated transport was at odds with the definition of 'network element' found in section 153(29) of the Act. Specifically, the court found that we erred in excluding these facilities from the definition of dedicated transport for purposes of implementing the section 251 unbundling obligation. The court noted, moreover, that '[i]f entrance facilities are correctly classified as 'network elements,' an analysis of impairment would presumably follow.'

**137.** The *USTA II* court did not reject our conclusion that incumbent LECs need not unbundle entrance facilities, only the analysis through which we reached that conclusion. In response to the court's remand, we reinstate the *Local Competition Order* definition of dedicated transport to the extent that it included entrance facilities, but we find that requesting carriers are not impaired without unbundled access to entrance facilities.

**138.** As the court suggested, we now conduct an impairment analysis with respect to entrance facilities and find that the economic characteristics of entrance facilities that we discussed in the *Triennial Review Order* support a national finding of non-impairment. Specifically, entrance facilities are less costly to build, are more widely available from alternative providers, and have greater revenue potential than dedicated transport between incumbent LEC central offices. As we noted in the *Triennial Review Order*, entrance facilities are used to transport traffic to a switch and often represent the point of greatest aggregation of traffic in a competitive LEC's network. Because of this aggregation potential, entrance facilities are more likely than dedicated transport between incumbent LEC offices to carry enough traffic to justify self-deployment by a competitive LEC. Moreover, competitive LECs have a unique degree of control over the cost of entrance facilities, in contrast to other types of dedicated transport, because they can choose the location of their own switches. For example, they can choose to locate their switches close to other competitors' switches, maximizing the ability to share costs and aggregate traffic, or close to transmission facilities deployed by other competitors, increasing the possibility of finding an alternative wholesale supply. In addition, they often can locate their switches close to the incumbent LEC's central office, minimizing the length and cost of entrance facilities.

**139.** The record in this proceeding also demonstrates that competitive LECs are increasingly relying on competitively provided entrance facilities. BellSouth notes, for example, that between October 2003 and September 2004, 10 percent to 20 percent of the entrance facilities it had provided to competitive LECs were replaced by facilities obtained from other sources. Verizon states that between early 2003 and mid-2004, it migrated more than 32,000 entrance facility circuits to non-Verizon facilities. No commenters in this proceeding have disputed this evidence, which indicates that wholesale alternatives to entrance facilities provided by incumbent LECs are widely available. And it appears that incumbent LECs and competitors alike continue to agree that entrance facilities are more competitively available than other types of dedicated transport.

**140.** We note in addition that our finding of non-impairment with respect to entrance facilities does not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2) for the transmission and routing of telephone exchange service and exchange access service. Thus, competitive LECs will have access to these [interconnection] facilities at cost-based rates to the extent that they require them to interconnect with the incumbent LEC's network.

**141.** The evidence described above convinces us that competitive LECs are not impaired without access to entrance facilities. We also conclude

that it would be inappropriate to apply the same impairment test to entrance facilities that we have adopted for other types of dedicated transport. As we have explained, entrance facilities are characterized by unique operational and economic characteristics that justify separate treatment: they are less costly to build, are more widely available from alternative providers, and have greater revenue potential than dedicated transport between incumbent LEC central offices. For these reasons, we do not apply our test for other types of dedicated transport to entrance facilities.

*TRRO*, 20 FCC Rcd. 2533, 2005 WL 289015, ¶¶ 136-141 (footnotes omitted).

In one sense, the question in this appeal concerns this passage from the *TRRO*: what does it say and what does it mean? And the parties' disagreement as to the meaning is central to the present dispute. So, let us begin by restating it, as clearly and succinctly as we can, and then proceed to what it means. Based on our plain reading, we find the most plausible "translation" to be:

**136**.  *In our last order, we drew two conclusions from a single premise:*

| | |
|---|---|
| *Premise:* | *Entrance facilities are not even a part of (i.e., not 'within') the ILEC's network. Therefore:* |
| *First Conclusion:* | *Entrance facilities do* not *need to be unbundled; and* |
| *Second Conclusion:* | *We do not even need to conduct an impairment analysis on entrance facilities.* |

    *Alas, when the* USTA II *court considered this proposition, it rejected our premise and our second conclusion.*

**137**.  *But the* USTA II *court did not reject our first conclusion, and we now reach that same conclusion again, albeit for a different reason.*

**138**.  *There is nothing monopolistic about entrance facilities. If you are a CLEC and you don't like the rates the ILEC is charging for use of its entrance facility, then build your own (or lease it from another CLEC that has built its own).*

**139**.  *Other CLECs are certainly doing that (i.e., building their own).*

**140**.    *And, rest assured, if you build your own entrance facility, the ILEC must still let you hook it up to its network (i.e., use its "interconnection facility") at wholesale rates.*

**141**.    *Therefore, entrance facilities need not be provided at TELRIC rates.*

So, the question becomes:  does this mean what it says?  The appellants contend that it does not.  But, to find a different meaning, it is necessary to complicate this discussion considerably.  That is, the appellants — the FCC, the MPSC Commissioners, and the CLECs — complicate this considerably.  Before explaining their position, however, we think a simple analogy may be helpful.

Suppose you lived next to a public park that had no electrical hook-up of its own.  And suppose that the village elders decided that, rather than installing an electrical hook-up in the park, they would allow park-goers to hook up to your electricity at your house (and because they compensated you enough to cover the added electricity usage plus a tidy profit, you eagerly agreed).  Thereafter, when park-goers arrived at the park needing electricity, you allowed them to plug into an electrical outlet in your garage.  This outlet is the "interconnection facility."

But, after a few days of having park-goers trample across your yard and enter your garage to plug into the electrical outlet on the wall inside the garage, you decide to buy one of those big orange extension cords, plug it into the outlet in your garage, and run it across your yard and into the park.  This makes access to the electricity closer to (and hence more convenient for) the park-goers, and they are no longer trampling your yard or entering your garage.  And note, because park-goers can still plug into the outlet in your garage if they want to (i.e., they need not plug into the big orange extension cord if they don't want to), the big orange extension cord is an "entrance facility" and the outlet in your garage remains the "interconnection facility."  Even if *all* the park-goers are plugging into the big orange extension cord, the cord is still an entrance facility.  The interconnection facility remains the outlet in the garage so long as the park-goers *could* plug in there if they wanted to.

As more park-goers arrive, you might put out a second big orange extension cord (i.e., a second "entrance facility"). And suppose that, at this point, all the park-goers are happily plugged into the big orange extension cords. Now suppose that a couple more park-goers arrive with their own big orange extension cords ("entrance facilities"), wanting to hook up to your electricity (as is their right). So, you get one of those surge protectors with six or eight plug-ins, plug it into the outlet in the garage, and plug your two big orange extension cords, as well as the two new park-goers' extension cords, into this surge protector. The big orange extension cord would still be the entrance facility, but the outlet in the surge protector would now be the "interconnection facility." By forcing the park-goers to plug into the surge protector (rather than the wall outlet), you have moved the "interconnection facility." (And here is a critical aside: if you forced the park-goers to plug in to the big orange extension cord — and forbade them from plugging into the wall outlet (or the surge protector) — the big orange extension cord would become the "interconnection facility." But, to ease the analogy, let's just assume you allowed them to plug into the surge protector.[9])

Now, some time later, you need a big orange extension cord for some other purpose (let's say, Christmas lights), but the park-goers are using your extension cords. So, you tell the park-goers that you are either going to take the extension cords back or charge for their use, so that you can buy yourself a new one. But the park-goers complain to the village that they were promised electricity and now you won't give it. The village elders think it over and decide that you are right: the electricity they promised did not include free use of your big orange extension cords, so they say:

---

[9]Of course, this aside is the very aside that confuses this whole situation in the present case — the FCC, MPSC, CLECs, and dissent argue (and two courts have agreed) that an "entrance facility" is an "interconnection facility" just because a CLEC can, could, or would use it to interconnect to the ILEC network. That is, they would argue that a big orange extension cord is an "interconnection facility" because the park-goers could or would use it to interconnect with the electrical outlet in the garage. But all of that misses the point, which is not whether the park-goers "can" use it to interconnect, but whether they "must." If you, as the homeowner, had said that they may plug into the surge protector, then the big orange extension cord is just an "entrance facility." But, if you had said they must plug into the big orange extension cord, then the big orange extension cord becomes the "interconnection facility" and, consequently, the park goers may plug into it for free, under your agreement with the village to provide them with electricity. So it goes with the ILECs and CLECs — only when the ILEC says that the CLEC *must* connect at the entrance facility would that entrance facility become an interconnection facility (and, consequently, require TELRIC rates). All of this is beside the point, however, because nothing in the record suggests that Michigan Bell has told the CLECs that they *must* connect at a purported entrance facility.

**138**.     There is nothing special about big orange extension cords. If you park-goers don't like the rate that the homeowner is going to charge you to use her extension cords (i.e., 'entrance facilities'), then bring your own (or lease one from another park-goer who has brought his or her own, if you can get a better deal).

**139**.     Other park-goers are certainly doing that (i.e., bringing their own extension cords).

**140**.     And, rest assured, if you bring your own big orange extension cord (i.e., 'entrance facility'), the homeowner must still let you plug it into her surge protector (i.e., her 'interconnection facility') at no cost, just as you were doing before.

**141**.     Therefore, the homeowner need not provide big orange extension cords (i.e., 'entrance facilities').

That all seems simple enough.

And it appears just as simple when we apply this analogy to the facts of our case. Michigan Bell offers each CLEC both an interconnection facility and an entrance facility. So long as Michigan Bell offers an interconnection facility at TELRIC rates (and in compliance with 47 C.F.R. § 51.305), it may charge competitive rates for the use of its entrance facilities. Correspondingly, the CLEC may connect directly to the interconnection facility (at TELRIC rates), connect to Michigan Bell's entrance facility (at Michigan Bell's competitive rate), or connect to a third party's entrance facility (at the third party's rate).

But the MPSC Commissioners, the CLECs, the dissent, and the two Circuit Courts to have considered this all see it another way. They explain that entrance facilities are used for two purposes: (1) to carry communications among CLEC customers (i.e., backhauling); and (2) to interconnect the CLEC to the ILEC network. And, relying on this — otherwise unmentioned[10] — premise, they argue that ¶¶ 137,

---

[10]The dissent contends that "backhauling" is not only mentioned, but that certain footnotes in the *TRRO*, ¶ 138 n.389 and ¶ 141 n.396, "draw that precise distinction" between backhauling and interconnection. Dis. Op. at ¶ 14. This is an overstatement of the *TRRO* and a misapprehension of the *TRO* as it is relied upon in those footnotes. First, the footnotes, which state in their entireties:

¶**138, n389.** [*TRO*, 18 FCC Rcd. 16978] at 17204-05, para. 367. The record contains evidence that competitive LECs are able to obtain entrance facilities from third-party providers. *See* NuVox Comments, Exh. A, Declaration of Keith Coker (NuVox Coker

138, and 141 say that the ILEC can charge competitive rates for the first use (i.e., backhauling), but ¶ 140 says that the ILEC must charge TELRIC rates for the other use (i.e., interconnection with the ILEC network). So, to complete our analogy, suppose a park-goer had taken the homeowner's big orange extension cord, strung it over a tree branch, and connected a light to the dangling end (resulting in a light dangling from the tree branch, via the big orange extension cord). Under this separate-use theory, the homeowner could charge the park-goer to use the extension cord for the purpose of holding the light off the ground, but not for conveying the electricity to that light.[11]

This separate-use theory requires several assumptions, none of which is easily defended. First, it requires us to assume that the FCC used two separate terms —

---

Decl.) at para. 3 ("[W]here available, NuVox utilizes third-party providers for **backhaul** from NuVox collocation arrangements to NuVox switches.")

**¶ 141 n.396.** *See Triennial Review Order*, 18 FCC Rcd at 17204, para. 367 ("[T]he economics of dedicated facilities used for **backhaul** between networks are sufficiently different from transport within an incumbent LEC's network that our analysis must adequately reflect this distinction.") We thus reject commenters' suggestions that entrance facilities should be subject to the same test that applies to dedicated transport between incumbent LEC facilities. *See* AT&T Comments at 50-52; Loop-Transport Coalition Comments at 87; ATX, Bayring, et al. Reply at 48; McLeod Reply at 37.

*TRRO*, 20 FCC Rcd. 2533, 2005 WL 289015 (Feb. 4. 2005) (emphasis added).

The first thing to note is that these two, seemingly incidental, references to backhauling — within the context of six paragraphs and 23 footnotes — are hardly the paragons of "precise distinction" the dissent suggests. The second thing to note is that the FCC's reference to backhauling in the *TRO* ¶ 367 was not in support of a separate-use theory, but rather, was in support of the separate-facilities scheme we have explained throughout this opinion. Specifically, the FCC used this distinction to support its position (since reversed) that entrance facilities are not even part of the ILEC's network, and therefore would not require any impairment analysis at all. *See TRO* ¶ 366 n. 1116 ("Our determination here effectively eliminates 'entrance facilities' as [unbundled network elements] and, therefore, moots the [FCC's pending notice of proposed rule making] insofar as it proposes limitations on obtaining entrance facilities as UNEs.") (overruled by *USTA II*, 539 F.3d 554).

[11] At this point, as we are about to abandon this big-orange-extension-cord analogy, we invite you to return momentarily to the foregoing paragraph, in which we restated *TRRO* ¶¶ 138-141 in terms of this analogy, and attempt to reconcile this separate-use theory with the statement in those paragraphs (138-141). It cannot be done. Similarly, the backhauling separate-use theory simply cannot be reconciled with the plain language of *TRRO* ¶¶ 138-141.

We should also, at this point, pause to address the dissent's two corollaries to this hypothetical: its "meet-point" and its "collocation" examples. The first is incorrect and the second is inapposite. The dissent says that "[a]n incumbent's portion of a meet-point facility, it turns out, is merely one manifestation of an entrance facility," Dis. Op. at ¶ 8, but that is simply untrue. An ILEC's portion of a meet-point facility — as described by the dissent and the regulations — is an "interconnection facility," whereas the CLEC's portion of the meet-point is an "entrance facility." The meet-point example fits perfectly within our framework. (For further explanation, see the next footnote.) The dissent also cites the "collocation" example. This is one of virtually limitless examples of an analogy being an imperfect fit, as would be the case with any analogy. As for the question of whether an interconnection facility is distinct and different from an entrance facility, however, this collocation example is wholly irrelevant.

"entrance facility" and "interconnection facility" — to describe the same exact wire, without any explanation why.**[12]**

Second, it requires us to assume that the FCC used "entrance facility" to refer to a particular use of that wire (i.e., for purposes of transporting data among CLEC customers (backhauling), rather than between the CLEC and ILEC),**[13]** even though the

---

**[12]**This assumption is the crux of the dissent's principal argument — that interconnection facilities and entrance facilities are really one and the same because "[e]ntrance facilities come within the ordinary meaning of a 'technically feasible method of obtaining interconnection.'" Dis. Op. at ¶ 7 (quoting 47 C.F.R. § 51.321(a)). That is, the dissent "reasons" that because ILECs must "provide . . . any technically feasible method of obtaining interconnection" at cost-based rates, *see* 47 C.F.R. § 51.321(a), and because entrance facilities are a technically feasible method of obtaining interconnection, the ILECs must therefore provide entrance facilities at cost-based rates.

We reject this argument for at least three reasons. First, this directly contradicts 47 C.F.R. § 51.319(e)(2)(i), which says that an ILEC is *not* obligated to provide entrance facilities at cost-based rates. Second, at least in our view, entrance facilities are not actually a "technically feasible means of obtaining interconnection" because they do not connect the CLEC with the ILEC network directly; entrance facilities, when used, connect the CLEC with the interconnection facility (i.e., ILEC ↔ Interconnection Facility ↔ Entrance Facility ↔ CLEC). And finally, even if entrance facilities were a technically feasible method of interconnection, 47 C.F.R. § 51.321(a) does not require the ILEC to provide an entrance facility rather than some other ("any"other) technically feasible means. The dissent's logic is flawed. Suppose, for example, a public school system was obligated to provide school children with a feasible means of transportation to and from school. A limousine is a feasible means of transportation — indeed, some children, at least on television, take limousines to and from school. So, by the dissent's logic, the school system would be obligated to provide limousines because limousines are a feasible means of transportation.

**[13]**The dissent eagerly accepts this assumption, suggesting that the *TRO* and the *TRRO* should be read in conjunction and arguing that the *TRO* establishes the separate-use distinction between backhauling and interconnection. Dis. Op. at ¶ 15.

"Why [else]," the dissent exclaims, "would the FCC clutter its unbundling analysis [in the *TRO*] by stressing the distinction between backhauling and interconnection?" Dis. Op. at ¶ 15 (citing *TRO* ¶ 365). If we treat this as a real inquiry, and not a rhetorical argument, the answer is plain. The FCC took an entirely different approach in the *TRO* — an approach that was later rejected by *USTA II* and reconsidered in the *TRRO* — in which it held that entrance facilities (no matter their use) were outside of the ILEC's network, so no impairment analysis was even necessary.

In the paragraph cited by the dissent (*TRO* ¶ 365), the FCC drew a distinction between interconnection facilities and entrance facilities, albeit without using those terms. In fact, the FCC did not use the phrase "interconnection facility" anywhere in the *TRO*; that is a phrase new to the *TRRO*. In the *TRO*, the FCC referred to what it now calls "interconnection facilities" as "interconnection points" (*see*, *e.g.*, *TRO* ¶¶ 7, 350 n.1058, 367 n.1120), designated certain types of these points (e.g., single point of interconnection (SPOI), minimum point of entry (MPOE)), and grouped these points by description as "the facilities that incumbent LECs explicitly must make available for section 251(c)(2) interconnection" (*TRO* ¶ 365). The FCC did not use the phrase "interconnection *points*" anywhere in the *TRRO*; it used the phrase "interconnection *facilities*." *See*, *e.g.*, *TRRO* ¶ 140. On the other side of that distinction, the FCC — in the *TRO* — described "entrance facilities" as "transmission facilities connecting incumbent LEC networks to competitive LEC networks for the purpose of backhauling traffic." *TRO* ¶ 365. So, the distinction between backhauling and interconnection is, again, not between *uses* but between *facilities*. The paragraph states, in pertinent part:

> [I]n order to access UNEs, including transmission between incumbent LEC switches or wire centers, while providing their own switching and other equipment, competitive LECs require a transmission link [i.e., an entrance facility] from the UNEs on the incumbent LEC network [i.e., interconnection facility] to their own equipment located elsewhere. Competitive LECs use these transmission connections between incumbent LEC networks and their own networks [i.e., entrance facilities] both for interconnection

FCC has never defined entrance facility that way. *See TRRO* ¶ 136 ("entrance facilities [are] the transmission facilities that connect competitive LEC networks with incumbent LEC networks"); 47 C.F.R. § 51.319(e)(2)(i) ("Entrance facilities [are] . . . dedicated transport that does not connect a pair of incumbent LEC wire centers").

Third, it requires us to assume that the FCC used the term "interconnection facility" to refer to a particular use of that wire (i.e., for purposes of transporting data between the CLEC and ILEC, rather than among CLEC customers), even though neither the FCC nor any court has ever defined interconnection that way. *See Local Competition Order*, 11 FCC Rcd. 15499, 1996 WL 452885, ¶ 176 (Aug. 8, 1996) ("the term 'interconnection' under section 251(c)(2) refers only to the physical linking of two networks"); *AT&T Corp. v. FCC*, 317 F.3d 227, 234 (D.C. Cir. 2003) ("to 'interconnect' and to exchange traffic have distinct meanings"; interconnect "refers only to 'facilities and equipment,' not to the provision of any service"); *Competitive Telecom. Ass'n v. FCC*, 117 F.3d 1068, 1071-72 (8th Cir. 1997) ("Congress intended 'for the transmission and routing of telephone exchange service and exchange access' only to describe what the interconnection, the physical link, would be used for. . . . By its own terms, this reference [to interconnection] is to a physical link, between the equipment of the carrier seeking interconnection and the LEC's network.").

---

> and to backhaul traffic. Unlike the facilities that incumbent LECs explicitly must make available for section 251(c)(2) interconnection [i.e., interconnection facilities], we find that the Act does not require incumbent LECs to unbundle transmission facilities connecting incumbent LEC networks to competitive LEC networks for the purpose of backhauling traffic [i.e., entrance facilities].

*TRO* ¶ 365 (footnote omitted). This same paragraph would read as follows if it were translated into the terms of the *TRRO* (i.e., using the phrases "entrance facility" and "interconnection facility"):

> In order to access the ILEC network, CLECs need a transmission link from the ILEC's interconnection facility to their own equipment located elsewhere, and this is called an "entrance facility." CLECs use these entrance facilities both for interconnection with the interconnection facility and to backhaul traffic. Unlike "interconnection facilities," which ILECs must make available for interconnection, the Act does not require ILECs to provide these "entrance facilities."

So, returning to the dissent's question: "Why . . . would the FCC clutter its unbundling analysis by stressing the distinction between backhauling and interconnection?" Dis. Op. at ¶ 15 (citing *TRO* ¶ 365). The answer is clear: to describe and differentiate two types of *facilities* for which it had not yet established names. And, "Why would [the FCC] underscore the incumbents' continuing obligation to provide interconnection facilities?" Dis. Op. at ¶ 15. Because interconnection facilities and entrance facilities are different things.

Finally, it requires us to assume that when Congress used the phrase "provide . . . interconnection *with* the [ILEC]'s network," 47 U.S.C. § 251(c) (emphasis added), Congress actually meant that the ILEC is obligated to "lease a physical facility (or wire)" *to* the CLEC rather than merely "make a plug-in available" *for* connection with the CLEC's facilities and equipment, even though this is an unnatural reading of the phrase, with no support in the statute.

In *Illinois Bell Telephone Co. v. Box*, 526 F.3d 1069, 1071-72 (7th Cir. 2008), the Seventh Circuit considered this issue and held that "[w]hat the FCC said in ¶ 140 is that ILECs must allow use of entrance facilities for interconnection at 'cost-based rates.'" But, the Seventh Circuit began its analysis by assuming the very question to be decided, stating:

> In the [*TRRO*], the FCC concluded that CLECs do not need entrance facilities *for backhauling* and should build their own equipment *for handling CLEC-to-CLEC traffic*. ILECs need not provide unbundled network elements to CLECs that can serve customers without 'impairment' through their own network elements. No one contests the FCC's conclusion in this litigation.

*Id*. at 1071 (citation omitted; emphasis added). But, these two[14] qualifiers — "for backhauling" and "for handling CLEC-to-CLEC traffic" — are nowhere to be found in the text of the *TRRO* passage at issue here. The Seventh Circuit added these, without explanation or justification.

If we remove those qualifiers from this passage, we have an interpretation of ¶ 140 that is both drastically different from the Seventh Circuit's and true to the plain language of the *TRRO*:

> In the *TRRO*, the FCC concluded that CLECs do not need [ILEC-provided] entrance facilities ~~for backhauling~~ and should build their own

---

[14]Obviously, this is actually just one qualifier, inasmuch as "for handling CLEC-to-CLEC traffic" is the definition of "backhauling," and why the Seventh Circuit used two separate labels is unclear — other than as a show of solidarity with the FCC and its claim that it used two separate labels for the same wire: "entrance facility" and "interconnection facility." In any event, we note them separately here to emphasize that neither term is actually included in the *TRRO* passage at issue here, nor is either term clearly connected to this passage when used elsewhere in the *TRRO*.

[entrance-facility] equipment ~~for handling CLEC-to-CLEC traffic~~. ILECs need not provide unbundled network elements to CLECs that can serve customers without 'impairment' through their own network elements.  No one contests the FCC's conclusion in this litigation.

Thus, we cannot join the Seventh Circuit's interpretation of the *TRRO*.

Using its qualifier-filled interpretation of ¶ 140 of the *TRRO*, the Seventh Circuit declared that this is the proper reading of the *TRRO* because this is what the FCC said in the *TRRO*.  But the Seventh Circuit's "reasoning" is entirely circular.  It said:

> AT&T protests that [by making entrance facilities available at TELRIC rates to the CLECs for interconnection, the state commission] nullifies the FCC's order.  What's the point of specifying that CLECs cannot demand access to entrance facilities as unbundled network elements, AT&T inquires, if state commissions can turn around and require the same access at the same price anyway? The answer . . . is that CLECs do not enjoy the 'same' access to entrance facilities under the state commission's decision as they did before the FCC's order.  Until then CLECs could use entrance facilities for both interconnection and backhauling.  Under the state's order, CLECs use entrance facilities exclusively for interconnection, *just as the FCC said in ¶ 140*.

*Id*. (emphasis added).  But once we omit the unexplained and unjustified qualifiers, and thereby remove the artificial distinction that they create (between backhauling and interconnection), it becomes clear that the act of making entrance facilities available at TELRIC rates for interconnection (but not backhauling) is insupportable inasmuch as its sole support (i.e., *TRRO* ¶ 140) actually says no such thing.  Consequently, we reject both the premise and the conclusion in *Illinois Bell*.

In *Southwestern Bell Telephone, L.P. v. Missouri Public Service Commission*, 530 F.3d 676, 683-84 (8th Cir. 2008), the Eighth Circuit considered this issue and reached the same conclusion as the Seventh Circuit.  After acknowledging the clear statement in the *TRRO* that CLECs are not impaired without access to entrance facilities, the Eighth Circuit turned right around and asserted that this finding "does not, however, alter the right of CLECs to obtain interconnection facilities pursuant to § 251(c)(2) for transmission and routing of telephone exchange service and exchange access service,

i.e., CLEC to ILEC and ILEC to CLEC traffic."  *Id*.  Without further explanation or justification (other than a "see" cite to *Box*, 526 F.3d at 1071-72), the court asserted:

> The FCC determined [that] when a CLEC uses entrance facilities to carry traffic to and from its own end users, i.e., backhauling or CLEC to CLEC, the CLEC is not entitled to obtain entrance facilities as UNEs at TELRIC rates.  If a CLEC needs entrance facilities to interconnect with an ILEC's network, it has the right to obtain such facilities from the ILEC.  Thus, CLECs must be provided access at TELRIC rates if necessary to interconnect with the ILEC's network.

*Id*.  But, as with *Box*, this conclusion is only true if the (assumed) premise is true, and it is not — the FCC made no backhauling distinction in the *TRRO* and the FCC has not said that CLECs have a right to entrance facilities for some purposes but not others.  The FCC has said that ILECs have no obligation to provide entrance facilities at TELRIC rates.  *See* 47 C.F.R. § 51.319(e)(2)(i).

We do not find these two cases persuasive.  The most plausible reading of the plain language of the *TRRO* is that the ILEC must allow the CLEC to connect its network to the ILEC's network, and may not charge the CLEC more than TELRIC rates for this connection.  If the ILEC requires the CLEC to connect at some point other than directly into its network, then the link (or "bridge" if the word "bridge" provides a better image) between the ILEC's designated connection point and the ILEC's network is what *TRRO* ¶ 140 refers to as an "interconnection facility," and the ILEC may charge only TELRIC rates for the use of that (or any) interconnection facility.

Any facility (link, "bridge," etc.) outside of the ILEC's designated connection point (i.e., the link that connects the CLEC to the ILEC's designated connection point, and from there to the ILEC network via the ILEC's interconnection facility), is *not* itself an "interconnection facility"; it is an "entrance facility."  Obviously, the CLEC would ultimately be using the entrance facility to connect its network with the ILEC's network (through the designated point, via the interconnection facility), but that is wholly immaterial.  The material distinction is not between interconnection and some other use (e.g., backhauling); the material distinction is between the ILEC's side of the designated

connection point (i.e., the "interconnection facility") and the CLEC's side of the designated connection point (i.e., the "entrance facility").

Moreover, the ILEC most assuredly has *no obligation to provide any entrance facility* and the CLEC has no obligation to use the ILEC's entrance facility (the CLEC can connect directly to the interconnection facility, rent someone else's entrance facility, or build its own entrance facility). Of course, if the ILEC chooses to provide an entrance facility, it must provide it *in addition to* the interconnection facility, *not instead of* the interconnection facility (as that would effectively change the designated connection point and transform the purported "entrance facility" into an "interconnection facility"). And, if the CLEC chooses to use the ILEC's entrance facility, it must pay the rates determined by the ILEC, in competition with other providers.

As we understand the situation in the case before us, the ILEC (Michigan Bell) offers its CLECs an interconnection facility at TELRIC rates and entrance facilities at competitive rates, which is in perfect accordance with the plain language of the *TRRO*. The MPSC ordered Michigan Bell to offer the CLECs the use of its entrance facilities at TELRIC rates, and based this order on its mistaken belief that *TRRO* ¶ 140 requires Michigan Bell to treat its entrance facilities as interconnection facilities any time the CLECs ultimately use them for interconnection. The district court rejected the MPSC's reading of the *TRRO*, and we agree with the district court's view.

**III.**

For all of the foregoing reasons, we **AFFIRM** the judgment of the district court.

———————————

**DISSENT**

———————————

SUTTON, Circuit Judge, dissenting.  The majority admirably pieces together the statutory, regulatory and technical components of this complicated case.  Together, the majority concludes, they show that the duty of the incumbent telecommunication provider, Michigan Bell, "to provide . . . interconnection with [its] network" to competitors at cost-based rates, 47 U.S.C. § 251(c)(2), requires only that Michigan Bell provide competitors with a place to plug into its local telephone network and that "entrance facilities" fall outside of this interconnection obligation.  That may be a reasonable interpretation.  So too, however, is the FCC's competing interpretation, one premised on an interpretation of its own regulations and one that we must respect as a result.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).  I accordingly respectfully dissent.

Prior to the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, incumbent local telephone companies, such as Michigan Bell, enjoyed a natural monopoly.  The high fixed costs of recreating a local telephone network, including running wires to each home and business in a community, together with the low marginal cost of operating a pre-existing network gave incumbents "an almost insurmountable competitive advantage." *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 490 (2001).  To combat these monopolies, the 1996 Act mandates that incumbents share their network with competitors at cost-based rates.  *See id.* at 489; *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999).

As part of this sharing obligation, incumbents must lease certain elements of their network to competitors on an "unbundled"—a la carte—basis and must do so at cost-based rates.  47 U.S.C. § 251(c)(3), (d)(2).  That allows a competitor to connect its network with other phone networks, to provide enhanced services to its customers or to expand its network so it can reach a broader potential customer base.  *See id.* § 153(29); *Triennial Review Order*, 18 F.C.C.R. 16978 ¶ 59 (2003); 47 C.F.R. § 51.319(a).  The

upshot of this duty is that, if a competitor wishes to offer phone service to everyone in a given community without incurring the up-front costs of running its own wire to each potential customer, the Act and implementing regulations facilitate the entrant's efforts by requiring the incumbent to offer these services on unbundled terms and at cost-based rates.

The Act imposes a related, but narrower, sharing obligation, one that also must be provided at cost-based rates. Incumbents must "provide . . . interconnection with [their] network" to competitors so customers on one network can seamlessly call customers on the other network. 47 U.S.C. § 251(c)(2); *see id.* § 251(d)(1); 47 C.F.R. § 51.5 (defining interconnection as the "linking of two networks for the mutual exchange of traffic"); FCC Br. at 4. In the absence of this obligation, no rational consumer would switch from the large incumbent to the competing entrant, at least without a steep discount. Who wants a local phone service that connects customers to just a handful of other individuals in the community? *See Verizon Commc'ns*, 535 U.S. at 490. By requiring cost-based rates for this service, the Act ensures that incumbents do not charge competition-dampening rates for interconnection, a not insignificant risk given that entrants need interconnection more than incumbents do.

Which brings me to "entrance facilities," the part of the network of the incumbent, Michigan Bell, at issue here. Entrance facilities physically link telecommunications networks together, *see Triennial Review Remand Order* (*TRRO*), 20 F.C.C.R. 2533 ¶¶ 136–39 (2005), and competitors use an incumbent's entrance facilities for two purposes: interconnection and backhauling. *See Triennial Review Order* ¶ 365. When used for interconnection, entrance facilities route traffic between one of the competitor's customers and one of the incumbent's customers. When used for backhauling, entrance facilities route traffic between two of the competitor's customers, likely because the competitor leases some elements of the incumbent's network, rather than between a customer of the competitor and a customer of the incumbent. *See id.* ¶¶ 365, 367.

In deciding what incumbents may charge for the use of their entrance facilities, the FCC interprets its regulations to draw a distinction.  On one side of the line, incumbents must lease their entrance facilities to competitors at cost-based rates when they use the facilities for interconnection. On the other side, incumbents may charge market-based rates, or not lease the facilities at all, when competitors use the facilities for backhauling.  *See* FCC Br. at 15–17, 20.  Everyone (at least everyone involved in this case) agrees that the FCC correctly concluded that incumbents may charge market-based rates for backhauling.  What divides the parties is whether the FCC correctly concluded that incumbents cannot do the same for interconnection.  In answering this question, we must keep in mind that Congress charged the FCC with administering § 251, *see* 47 U.S.C. § 251(d)(1), and the FCC wrote the regulations at issue, all of which means that the FCC's interpretation binds us unless it flouts the regulations' text.  *See Auer*, 519 U.S. at 461.

The line drawn by the FCC permissibly interprets its own regulation.  In elaborating on § 251(c)(2)'s duty to "provide . . . interconnection," the FCC's regulation says that incumbents must provide "any technically feasible method of obtaining interconnection" at cost-based rates.  47 C.F.R. § 51.321(a).  Entrance facilities come within the ordinary meaning of a "technically feasible method of obtaining interconnection."  They are "designed for the very purpose of linking two carriers' networks."  *Ill. Bell Tel. Co. v. Box*, 526 F.3d 1069, 1072 (7th Cir. 2008).  And that is how competitors use them—to bridge the gap between their network and an interconnection point within the incumbent's network so that the two networks can mutually exchange traffic.  *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 586 (D.C. Cir. 2004).

In providing illustrative examples of an incumbent's interconnection duties in § 51.321, the FCC confirms that the regulation uses the phrase "method of obtaining interconnection" in its ordinary sense—one that applies to entrance facilities.  One example says that incumbents upon request must interconnect with competitors through meet point facilities, *see* 47 C.F.R. § 51.321(b)(2), which requires the incumbent and

competitor to build transmission facilities from their respective networks to a designated meet point and to link the two transmission facilities together at that point "for the mutual exchange of traffic," *Local Competition Order*, 11 F.C.C.R. 15499 ¶ 553 (1996). An incumbent's portion of a meet point facility, it turns out, is merely one manifestation of an entrance facility, as entrance facilities are "the transmission facilities that connect competitive LEC networks with incumbent LEC networks." *See TRRO* ¶ 136. Another example—dealing with collocation, which is installing and maintaining equipment for use solely by the competitor at an incumbent's physical facilities, *see* 47 C.F.R. § 51.5—also shows that an incumbent's duty to provide methods of obtaining interconnection covers facilities that aid in bridging the gap between two networks. *See* 47 U.S.C. § 251(c)(6) (mandating that incumbents allow physical or virtual "collocation of equipment necessary for interconnection"); 47 C.F.R. § 51.321(b)(1).

To put all of this in context, it might help to return to the majority's extension-cord analogy. The meet-point example is akin to saying that the homeowner sometimes must provide a park-goer with an extension cord, at a cost-based price, that links the outlet in the garage with the park-goer's extension cord, rather than forcing the park-goer to run an extension cord all the way from the park to the garage or forcing the park-goer to pay the homeowner market-based rates for the use of one of its cords. The collocation obligation is akin to saying that the homeowner sometimes must let park-goers store an extension cord on a reel in the garage and access the garage when they want to extend the cord from the garage to the park. As these examples show, an incumbent's interconnection duty encompasses more than providing competitors with an outlet to plug into.

The *Triennial Review Remand Order* does not undermine the FCC's position. The *TRRO* represents the FCC's fourth attempt to promulgate valid unbundling regulations, *see Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 531 (D.C. Cir. 2006), and it aims to satisfy the D.C. Circuit's concerns in setting aside the FCC's previous unbundling regulations, *see TRRO* ¶¶ 1–4, 13, 19–20. Nearly a quarter of the order

clarifies the FCC's overarching unbundling analysis and not one paragraph discusses how the FCC analyzes interconnection obligations. *See id.* ¶¶ 20–65.

The one section that mentions entrance facilities confirms the *TRRO*'s focus on unbundling, not interconnection. The section analyzes whether competitors would be "impair[ed]" without unbundled access to entrance facilities under § 251(c)(3), and it concludes that they would not be. *See TRRO* ¶¶ 136–41; *see also* 47 U.S.C. § 251(d)(2). Yet, as the FCC points out, an impairment analysis has no role to play under § 251(c)(2), *see* 47 U.S.C. § 251(d)(2); FCC Br. at 16, and the FCC has never, to my knowledge, considered impairment when analyzing an incumbent's interconnection obligations. *See Ill. Bell*, 526 F.3d at 1072 (noting that whether an incumbent can charge market-based rates for interconnection "is not related to the scope of an [incumbent's] obligations under § 251(c)(3) to furnish unbundled network elements"). It would be surprising, then, if the *TRRO* exempted entrance facilities from the pre-existing obligations of 47 C.F.R. § 51.321(a) through a novel analysis without comment.

The *TRRO*'s sole mention of interconnection in the context of entrance facilities instead sounds a cautionary note: No one should read the FCC's categorical unbundling analysis under § 251(c)(3) as affecting incumbents' interconnection duties under § 251(c)(2). *See TRRO* ¶ 140 (stating "our finding of non-impairment with respect to entrance facilities does not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2)"). This cautionary note makes perfect sense if, as the FCC and both courts of appeals to address this issue have concluded, entrance facilities used for interconnection fall within § 251(c)(2)'s interconnection obligation. *See Ill. Bell*, 526 F.3d at 1071–72 ("What the FCC said in ¶ 140 is that [incumbents] must allow use of entrance facilities for interconnection at 'cost-based rates'."); *Sw. Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n*, 530 F.3d 676, 684 (8th Cir. 2008).

The regulations promulgated by the *TRRO*, moreover, discuss only unbundling obligations. They say that "in accordance with section 251(c)(3)"—the provision imposing the unbundling requirement—an incumbent "is not obligated to provide a requesting carrier with *unbundled access*" to entrance facilities. 47 C.F.R. § 51.319(e)

(emphasis added); *see also TRRO*, 20 F.C.C.R. at 2682. This speaks only to an incumbent's unbundling obligation, not its narrower, independent duty to "provide . . . interconnection" under § 251(c)(2). Michigan Bell disagrees, claiming the regulation "unequivocal[ly]" states that incumbents have no obligation to provide entrance facilities, period. Michigan Bell Br. at 23. But this turns the phrase "with unbundled access" into a useless appendage. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 59–60 (2007) (noting general rule that courts should give effect to all words in a provision).

Michigan Bell reads the *TRRO* differently. The *TRRO*, it says, draws no distinction between the functions of an entrance facility (backhauling versus interconnection), but instead draws a distinction between two distinct and mutually exclusive types of facilities (entrance versus interconnection). The text of ¶¶ 136–41, it is true, does not distinguish between backhauling and interconnection. But the footnotes to those paragraphs draw that precise distinction. *See TRRO* ¶¶ 138 n.389, 141 n.396. And even if the FCC had not drawn this functional line, that would not eliminate ambiguity about the point; the silence would create ambiguity, particularly since the FCC consistently has drawn functional lines when implementing the 1996 Act. *See Triennial Review Order* ¶¶ 365–67; *Local Competition Order* ¶ 553. Either way, *Auer* deference applies to the FCC's position that those paragraphs draw a functional line that exempts incumbents only from the obligation to lease their entrance facilities at cost-based rates when competitors use those facilities for backhauling, as opposed to interconnection.

Michigan Bell's competing interpretation also fits awkwardly with the *TRRO* and its predecessor, the *Triennial Review Order*. Why, if that interpretation is correct, would the FCC clutter its unbundling analysis by stressing the distinction between backhauling and interconnection? *See Triennial Review Order* ¶ 365. And why would it underscore the incumbents' continuing obligation to provide interconnection facilities? *See id.*; *TRRO* ¶ 140. These points of emphasis make little sense if entrance facilities never function as § 251(c)(2) interconnection facilities.

To support its mutual exclusivity theory, the majority notes that incumbents may choose whether a facility counts as an entrance facility or an interconnection facility. If the incumbent requires that competitors interconnect at that facility, then it is an interconnection facility. But if the incumbent provides a facility that bridges the gap between the incumbent-designated interconnection point and the competitor's network, then it counts as an entrance facility. This premise, however, does not square with § 251(c)(2), which requires incumbents to "provide . . . interconnection" "at *any* technically feasible point within [its] network." 47 U.S.C. § 251(c)(2) (emphasis added); *see also Local Competition Order* ¶ 209 (stating that § 251(c)(2) allows competitors "to select the points in an incumbent['s] . . . network at which they wish to deliver traffic"). And in the absence of this premise, I see no workable way to distinguish between these two supposedly distinct and mutually exclusive types of facilities.

One more point. While the majority's principal objection to this analysis is that the regulation is plain as day and thus leaves no room for administrative deference, it also suggests two reasons for ignoring *Auer* deference altogether. *First*, it cites a Seventh Circuit case, which suggests that agency *amicus* briefs (like the one filed here) should get *Auer* deference only at the Supreme Court, not at the court of appeals. Until a case reaches the Supreme Court, goes the view, agency briefs represent "unreviewed staff decisions," and Congress could not have meant to delegate "the power to make law to fill gaps in" the law to low-level staff. *Keys v. Barnhart*, 347 F.3d 990, 993–94 (7th Cir. 2003).

A deference doctrine that turns on whether a brief was filed in the United States Supreme Court or a court of appeals has little to commend it. An "inferior" appellate court, U.S. Const. art. III § 1, has just as many reasons, if not more, to learn the agency's interpretation of one of its regulations in the course of resolving a dispute between two private parties before it issues a decision rather than after. This case is a perfectly good example. The regulations are intricate and complex, and as a result we called for the views of the FCC in order to understand how the agency construed its regulations and to make sure we were not missing something in the process. The Seventh Circuit may

or may not be right that, when a court of appeals invites an agency to take a position in a given case, it can expect nothing more than "unreviewed staff decisions." As for myself, I doubt it, and if I am wrong that suggests a management problem, not a proper view of how agencies should operate. It seems likely that agencies take their *amicus* briefs—particularly those filed *at the request* of a court of appeals—at least as seriously as their more frequent opinion letters, which also receive *Auer* deference, *see Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 563–64 (1980). As agencies must well appreciate, moreover, lower courts reap the same benefits as the Supreme Court from an agency's "fair and considered judgment," *Auer*, 419 U.S. at 462, including the advantage of the agency's "unique expertise and policymaking prerogatives," *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151 (1991). In any event, the Supreme Court has strongly hinted that *Auer* deference does not turn on whether an agency's position was prepared by its staff or its head. *See Ford Motor Credit Co.*, 444 U.S. at 566 n.9. There is, in short, no reason why an agency brief—particularly one filed at the request of a court—becomes less authoritative because it is filed with a court based in Cincinnati, Ohio rather than one based in Washington, D.C.

*Second*, the majority suggests that the *TRRO* does not deserve *Auer* deference because it is an interpretive rule, not a legislative one. I disagree with the majority's characterization of the *TRRO* and its suggestion that interpretive rules do not deserve *Auer* deference. The FCC had a formal notice-and-comment period before issuing the *TRRO*, and the *TRRO* concludes by adopting seven pages of amendments to the Code of Federal Regulations. *See TRRO* ¶¶ 18–19, 239–251, App'x A, App'x B. The *TRRO* in point of fact promulgates the version of 47 C.F.R. § 51.319(e)(2)(i) that the majority quotes. *See TRRO* at 2677, 2682; Maj. Op. at 9–10. All of this confirms that the *TRRO* is a legislative rule. *See Lincoln v. Vigil*, 508 U.S. 182, 195–196 (1993); *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 949 (6th Cir. 2000) ("[I]f by its action the agency intends to create new law . . . , the rule is properly considered to be a legislative rule.").

Perhaps the majority means that ¶¶ 136–40 of the *TRRO* do not deserve deference because those paragraphs are part of the "concise general statement" of the *TRRO*'s "basis and purpose," 5 U.S.C. § 553(c), not amendments to the federal code. *See* Maj. Op. at 7 n.6 ("[T]he *TRRO* . . . is . . . not a true 'regulation.'"). I am unaware of any court reading such a line into *Auer*. No one has done so, I believe, because "[c]ourts and Congress treat the terms 'regulation' and 'rule' as interchangeable," *Nat'l Treasury Employees Union v. Weise*, 100 F.3d 157, 160 (D.C. Cir. 1996), and "concise general statements" are part of the rule, *see* 5 U.S.C. § 553(c); *Lincoln*, 508 U.S. at 195–96. Justice Scalia's concurrence in *Couer Alaska* is not to the contary. *See Couer Alaska, Inc. v. Se. Alaska Conservation Council*, ___ U.S. ___, 129 S. Ct. 2458, 2479 (noting courts defer under *Auer* only "to an agency's interpretation of *its own ambiguous regulation*."). Justice Scalia was distinguishing between regulations and statutes, not between sections of a legislative rule. *See id.*

But whether the *TRRO* is an interpretive or legislative rule is beside the point. We generally defer to an agency's interpretation of its own rules because it "make[s] little sense" to impose our interpretation on the agency when it remains free to rewrite the rule (largely) however it wants. *Auer*, 519 U.S. at 463. That rationale applies with extra force to interpretive rules: An agency could amend its interpretive rule and wipe a court's interpretation off the board without even the delay of notice-and-comment rulemaking.

In the final analysis, the FCC's interpretation reasonably respects the words of its regulations and *Auer* requires us to respect that interpretation. The majority seeing it differently, I respectfully dissent.