(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TALK AMERICA, INC. *v.* MICHIGAN BELL TELE-PHONE CO. DBA AT&T MICHIGAN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 10–313.  Argued March 30, 2011—Decided June 9, 2011*

The Telecommunications Act of 1996 requires incumbent local exchange carriers (LECs)—*i.e.*, providers of local telephone service—to share their physical networks with competitive LECs at cost-based rates in two ways relevant here. First, 47 U. S. C. §251(c)(3) requires an incumbent LEC to lease "on an unbundled basis"—*i.e.*, a la carte—network elements specified by the Federal Communications Commission (FCC) to allow a competitor to create its own network without having to build every element from scratch. In identifying those elements, the FCC must consider whether access is "necessary" and whether failing to provide it would "impair" the competitor's provision of service. §251(d)(2). Second, §251(c)(2) mandates that incumbent LECs "provide . . . interconnection" between their networks and competitive LECs' to ensure that a competitor's customers can call the incumbent's customers, and vice versa. The interconnection duty is independent of the unbundling rules and not subject to impairment analysis.

In 2003, the FCC issued its *Triennial Review Order* deciding, contrary to previous orders, that §251(c)(3) did not require an incumbent LEC to provide a competitive LEC with cost-based unbundled access to existing "entrance facilities"—*i.e.,* transmission facilities (typically wires or cables) that connect the two LECs' networks—because such facilities are not network elements at all. The FCC noted, however, that entrance facilities are used for both interconnection and backhauling, and it emphasized that its order did not alter incumbent

—————

*Together with No. 10–329, *Isiogu et al.* v. *Michigan Bell Telephone Co. dba AT&T Michigan,* also on certiorari to the same court.

                      Syllabus

LECs' §251(c)(2) obligation to provide for interconnection.  Thus, the
practical effect of the order was only that incumbent LECs were not
obligated to unbundle entrance facilities for backhauling purposes.

In 2005, following D. C. Circuit review, the FCC issued its *Trien-
nial Review Remand Order*.  The FCC retreated from the view that
entrance facilities are not network elements, but adhered to its pre-
vious position that cost-based unbundled access to such facilities
need not be provided under §251(c)(3).  Treating entrance facilities as
network elements, the FCC concluded that competitive LECs are not
impaired without access to such facilities.  The FCC again empha-
sized that competitive LECs' §251(c)(2) right to obtain interconnec-
tion had not been altered.

In the *Remand Order*'s wake, respondent AT&T notified competi-
tive LECs that it would no longer provide entrance facilities at cost-
based rates for either backhauling or interconnection, but would in-
stead charge higher rates.  Competitive LECs complained to the
Michigan Public Service Commission that AT&T was unlawfully ab-
rogating their §251(c)(2) right to cost-based interconnection.  The
Michigan Public Service Commission agreed and ordered AT&T to
continue providing entrance facilities for interconnection at cost-
based rates.  AT&T challenged the ruling.  Relying on the *Remand
Order*, the Federal District Court ruled in AT&T's favor.  The Sixth
Circuit affirmed, declining to defer to the FCC's argument that the
order did not change incumbent LECs' interconnection obligations,
including the obligation to lease entrance facilities for interconnec-
tion.

*Held:* The FCC has advanced a reasonable interpretation of its regula-
tions—*i.e.,* that to satisfy its duty under §251(c)(2), an incumbent
LEC must make its existing entrance facilities available to competi-
tors at cost-based rates if the facilities are to be used for interconnec-
tion—and this Court defers to the FCC's views.  Pp. 6–16.

(a) No statute or regulation squarely addresses the question.  Pp.
6–7.

(b) Absent an unambiguous statute or regulation, the Court turns
to the FCC's interpretation of its regulations in its *amicus* brief.  See,
*e.g., Chase Bank USA, N. A.* v. *McCoy*, 562 U. S. ___, ___.  The FCC
proffers a three-step argument why its regulations require AT&T to
provide access at cost-based rates to existing entrance facilities for
interconnection purposes.  Pp. 7–10.

(1) Interpreting 47 CFR §51.321(a), the FCC first contends that
an incumbent LEC must lease "technically feasible" facilities for in-
terconnection.  Pp. 8–9.

(2) The FCC contends, second, that existing entrance facilities
are part of an incumbent LEC's network, 47 CFR §51.319(e), and

therefore are among the facilities that an incumbent LEC must lease for interconnection, if technically feasible. P. 9.

(3) Third, says the FCC, it is technically feasible to provide access to the particular entrance facilities at issue in these cases—a point AT&T does not dispute. P. 10.

(c) Contrary to AT&T's arguments, the FCC's interpretation is not "plainly erroneous or inconsistent with the regulation[s]. " *Auer* v. *Robbins*, 519 U. S. 452, 461. First, it is perfectly sensible to read the FCC's regulations to include entrance facilities as part of incumbent LECs' networks. Second, the FCC's views do not conflict with 47 CFR §51.5's definition of interconnection as "the linking of two networks for the mutual exchange of traffic[, but not] the transport and termination of traffic." Pp. 10–12.

(d) Nor is there any other "reason to suspect that the [FCC's] interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer, supra*, at 462. AT&T incorrectly suggests that the FCC is attempting to require under §251(c)(2) what courts have prevented it from requiring under §251(c)(3) and what the FCC itself said was *not* required in the *Remand Order*. Pp. 12–16.

597 F. 3d 370, reversed.

THOMAS, J., delivered the opinion of the Court, in which all other Members joined, except KAGAN, J., who took no part in the consideration or decision of the cases. SCALIA, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 10–313 and 10–329

———

TALK AMERICA, INC., PETITIONER
10–313                    *v.*
MICHIGAN BELL TELEPHONE COMPANY
DBA AT&T MICHIGAN


ORJIAKOR ISIOGU, ET AL., PETITIONERS
10–329                    *v.*
MICHIGAN BELL TELEPHONE COMPANY
DBA AT&T MICHIGAN

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 9, 2011]

JUSTICE THOMAS delivered the opinion of the Court.

In these cases, we consider whether an incumbent provider of local telephone service must make certain transmission facilities available to competitors at cost-based rates. The Federal Communications Commission (FCC or Commission) as *amicus curiae*[1] contends that its regulations require the incumbent provider to do so if the facili-

_____

[1] The Solicitor General, joined by counsel for the FCC, represents that the *amicus* brief for the United States filed in this Court reflects the Commission's considered interpretation of its own rules and orders. Brief for United States as *Amicus Curiae* 31. We thus refer to the Government's arguments in these cases as those of the agency. See, *e.g.*, *Chase Bank USA, N. A.* v. *McCoy*, 562 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 8).

ties are to be used for interconnection: to link the incumbent provider's telephone network with the competitor's network for the mutual exchange of traffic. We defer to the Commission's views and reverse the judgment below.

I

The Telecommunications Act of 1996 (1996 Act), 110 Stat. 56, imposed a number of duties on incumbent providers of local telephone service in order to facilitate market entry by competitors. *AT&T Corp.* v. *Iowa Utilities Bd.*, 525 U. S. 366, 371 (1999). The incumbent local exchange carriers (LECs) owned the local exchange networks: the physical equipment necessary to receive, properly route, and deliver phone calls among customers. *Verizon Communications Inc.* v. *FCC*, 535 U. S. 467, 490 (2002). Before the 1996 Act, a new, competitive LEC could not compete with an incumbent carrier without basically replicating the incumbent's entire existing network. *Ibid.*

The 1996 Act addressed that barrier to market entry by requiring incumbent LECs to share their networks with competitive LECs in several ways, two of which are relevant here. First, 47 U. S. C. §251(c)(3) requires incumbent LECs to lease "on an unbundled basis"—*i.e.*, a la carte—network elements specified by the Commission. This makes it easier for a competitor to create its own network without having to build every element from scratch. In identifying which network elements must be available for unbundled lease under §251(c)(3), the Commission is required to consider whether access is "necessary" and whether failing to provide access would "impair" a competitor's provision of service. §251(d)(2). Second, §251(c)(2) mandates that incumbent LECs "provide . . . interconnection" between their networks and competitive LECs' facilities. This ensures that customers on a competitor's network can call customers on the incumbent's network, and vice versa. The interconnection duty is

independent of the unbundling rules and not subject to impairment analysis. It is undisputed that both unbundled network elements and interconnection must be provided at cost-based rates. See §252(d)(1); Brief for Petitioner in No. 10–313, p. 28; Brief for Petitioners in No. 10–329, p. 7; Brief for Respondent 4.

These cases concern incumbent LECs' obligation to share existing "entrance facilities" with competitive LECs. Entrance facilities are the transmission facilities (typically wires or cables) that connect competitive LECs' networks with incumbent LECs' networks. The FCC recently adopted a regulation specifying that entrance facilities are not among the network elements that §251(c)(3) requires incumbents to lease to competitors on an unbundled basis at cost-based rates. See 47 CFR §51.319(e)(2)(i) (2005). The Commission noted, however, that it "d[id] not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2)." *In re Unbundled Access to Network Elements*, 20 FCC Rcd. 2533, 2611, ¶140 (2005) *(Triennial Review Remand Order)*.

The specific issue here is whether respondent, Michigan Bell Telephone Company d/b/a AT&T Michigan (AT&T), must lease existing entrance facilities to competitive LECs at cost-based rates. The FCC interprets its regulations to require AT&T to do so for the purpose of interconnection. We begin by reviewing the Commission's recent actions regarding entrance facilities and then explain the particular dispute that is before us today.

A

In 2003, the FCC decided, contrary to its previous orders, that incumbent LECs were not obligated to provide cost-based unbundled access to entrance facilities under §251(c)(3). *In re Review of Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 FCC Rcd. 16978, 17202–17205, ¶¶365–367 (2003) *(Triennial*

*Review Order).* Explaining that its previous approach had
been "misguided" and "overly broad," *id.*, ¶¶366, 365, the
Commission concluded that entrance facilities were not
subject to the unbundling requirement because they are
not network elements at all. See *id.*, ¶366 (entrance facili-
ties "exist *outside* the incumbent LEC's local network").
The Commission therefore did not conduct an impairment
analysis.

The FCC emphasized, however, the limits of this ruling.
Entrance facilities are used for two purposes: interconnec-
tion and backhauling.[2] It expressly "d[id] not alter" an
incumbent LEC's obligation under §251(c)(2) to provide
"facilities in order to 'interconnect with the incumbent
LEC's network.'" *Id.,* ¶366 (brackets omitted). Thus, al-
though the Commission specified that §251(c)(3) did not
require any unbundled leasing of entrance facilities, it
determined in practical effect only that "incumbent LECs
[were not obligated] to unbundle [entrance facilities] for
the purpose of backhauling traffic." *Id.,* ¶365.

On direct review, the D. C. Circuit questioned the Com-
mission's determination that entrance facilities are not
network elements under §251(c)(3), but found the agency
rulemaking record insufficient and remanded to the
Commission for further consideration. See *United States
Telecom Assn.* v. *FCC*, 359 F. 3d 554, 586, cert. denied, 543
U. S. 925 (2004). The court noted that if entrance facilities
were in fact "'network elements,'" then "an analysis of

──────────

[2] Although the parties and their *amici* disagree over the precise defi-
nition of backhauling, they all appear to agree that backhauling is
important to competitive LECs and occurs when a competitive LEC
uses an entrance facility to transport traffic from a leased portion of an
incumbent network to the competitor's own facilities. Backhauling does
not involve the exchange of traffic between incumbent and competitive
networks. See, *e.g.,* Brief for Petitioners in No. 10–329, p. 25; Brief for
United States Telecom Association et al. as *Amici Curiae* 32. It thus
differs from interconnection—"the linking of two networks for the
mutual exchange of traffic." 47 CFR §51.5 (2010).

impairment would presumably follow." 359 F. 3d, at 586.

In 2005, the Commission responded. See *Triennial Review Remand Order* ¶¶136–141. The Commission retreated from its view that entrance facilities are not network elements but adhered to its previous position that cost-based unbundled access to them need not be provided under §251(c)(3). *Id.,* ¶¶137–138. Treating entrance facilities as network elements, the Commission concluded that competitive LECs are not impaired without access to them. *Ibid.* The Commission again emphasized that it "d[id] not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2)." *Id.,* ¶140.

## B

In the wake of the *Triennial Review Remand Order*, AT&T notified competitive LECs that it would no longer provide entrance facilities at cost-based rates for either backhauling or interconnection, but would instead charge higher rates. Competitive LECs complained to the Michigan Public Service Commission (PSC) that AT&T was unlawfully abrogating their right to cost-based interconnection under §251(c)(2). The Michigan PSC agreed with the competitive LECs and ordered AT&T to continue providing entrance facilities for interconnection at cost-based rates.

AT&T challenged the Michigan PSC's ruling in the District Court, which, relying on the *Triennial Review Remand Order*, ruled in AT&T's favor. The Michigan PSC and several competitive LECs, including petitioner Talk America, Inc., appealed.

The Court of Appeals for the Sixth Circuit affirmed over a dissent. *Michigan Bell Telephone Co.* v. *Covad Communications Co.*, 597 F. 3d 370 (2010). At the court's invitation, the FCC filed a brief as *amicus curiae*, arguing that the *Triennial Review Remand Order* did not change in-

cumbent LECs' interconnection obligations, including the
obligation to lease entrance facilities for interconnection.
The Sixth Circuit declined to defer to the FCC's views, 597
F. 3d, at 375, n. 6, and also expressly disagreed with the
Seventh and Eighth Circuits, *id.,* at 384–386 (discussing
*Illinois Bell Tel. Co.* v. *Box*, 526 F. 3d 1069 (2008),
and *Southwestern Bell Tel., L. P.* v. *Missouri Pub. Serv.
Comm'n*, 530 F. 3d 676 (2008)).[3]

   We granted certiorari, 562 U. S. ___ (2010), and now
reverse.

## II

   Petitioners contend that AT&T must lease its existing
entrance facilities for interconnection at cost-based rates.
We agree.

## A

   No statute or regulation squarely addresses whether an
incumbent LEC must provide access to entrance facilities
at cost-based rates as part of its interconnection duty
under §251(c)(2). According to the statute, each incum-
bent LEC has:

   "The duty to provide, for the facilities and equip-
   ment of any requesting telecommunications carrier,
   interconnection with the local exchange carrier's net-
   work—
      "(A) for the transmission and routing of telephone
   exchange service and exchange access;
      "(B) at any technically feasible point within the car-
   rier's network;
      "(C) that is at least equal in quality to that provided
   by the local exchange carrier to itself or to any sub-
   sidiary, affiliate, or any other party to which the car-

---

   [3] The Ninth Circuit has since joined the Seventh and Eighth Circuits.
*Pacific Bell Tel. Co.* v. *California Pub. Util. Comm'n*, 621 F. 3d 836
(2010).

rier provides interconnection; and

"(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title."

Nothing in that language expressly addresses entrance facilities. Nor does any regulation do so. See Brief for United States as *Amicus Curiae* 22, n. 6.

AT&T contends that the statute makes clear that an incumbent LEC need not provide access to *any* facilities—much less entrance facilities—to provide interconnection. The company points out that §251(c)(2) does not mention incumbent LECs' facilities, but rather mandates only that incumbent LECs provide interconnection "for the facilities and equipment of any [competing] carrier." In contrast, AT&T notes, §251(c)(3) requires that incumbent LECs provide unbundled "access to [their] network elements."

We do not find the statute so clear. Although §251(c)(2) does not expressly require that incumbent LECs lease facilities to provide interconnection, it also does not expressly excuse them from doing so. The statute says nothing about what an incumbent LEC must do to "provide . . . interconnection." §251(c)(2). "[T]he facilities and equipment of any [competing] carrier" identifies the equipment that an incumbent LEC must allow to interconnect, but it does not specify what the incumbent LEC must do to make the interconnection possible. *Ibid.*

B

In the absence of any unambiguous statute or regulation, we turn to the FCC's interpretation of its regulations in its *amicus* brief. See, *e.g., Chase Bank USA, N. A.* v. *McCoy*, 562 U. S. ___, ___ (2011) (slip op., at 12). As we reaffirmed earlier this Term, we defer to an agency's interpretation of its regulations, even in a legal brief,

unless the interpretation is "'plainly erroneous or incon-
sistent with the regulation[s]'" or there is any other "'rea-
son to suspect that the interpretation does not reflect the
agency's fair and considered judgment on the matter in
question.'" *Id.*, at ___, ___ (slip op., at 12, 14) (quoting
*Auer* v. *Robbins*, 519 U. S. 452, 461, 462 (1997)).

The Commission contends that its regulations require
AT&T to provide access at cost-based rates to its exist-
ing entrance facilities for the purpose of interconnection.
The Commission's interpretation proceeds in three steps.
First, an incumbent LEC must lease "technically feasible"
facilities for interconnection. Second, entrance facili-
ties are among the facilities that an incumbent must
make available for interconnection, if technically feasible.
Third, it is technically feasible to provide access to the
particular entrance facilities at issue in these cases.

1

The Commission first contends that an incumbent LEC
must lease, at cost-based rates, any requested facilities
for obtaining interconnection with the incumbent LEC's
network, unless it is technically infeasible to do so. Sec-
tion 251(c)(2) mandates that an incumbent LEC provide
interconnection, at cost-based rates, "at any technically
feasible point within the carrier's network." The FCC
has long construed §251(c)(2) to require incumbent LECs
to provide, at cost-based rates, "any technically feasible
method of obtaining interconnection . . . at a particular
point." 47 CFR §51.321(a) (2010).

The requirement in §51.321(a) to provide a "method of
obtaining interconnection," the Commission argues, en-
compasses a duty to lease an existing facility to a compet-
ing LEC. When the Commission originally promulgated
§51.321(a), it explained that incumbent LECs would be
required to "adapt their facilities to interconnection" and
to "accept the novel use of, and modification to, [their]

network facilities." *In re Implementation of Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd. 15499, 15605, ¶202 (1996) *(Local Competition Order)*. Since then, as AT&T and its *amici* concede, incumbent LECs have commonly leased certain facilities at cost-based prices to accommodate interconnection. See Brief for Respondent 28–29; Brief for United States Telecom Association et al. as *Amici Curiae* 33–35.

As additional support for its assertion that incumbent LECs are obligated to lease facilities, the FCC highlights the examples in §51.321(b) of "[t]echnically feasible methods of obtaining interconnection," which include "[m]eet point interconnection arrangements." In a meet-point arrangement, an incumbent LEC "accommodat[es]" interconnection by building a transmission facility from its network to a designated point, where it connects with the competitor's corresponding transmission facility. *Local Competition Order* ¶553. Compared to that requirement, the Commission argues, the obligation to lease existing facilities for interconnection is quite modest.

2

Next, the Commission contends that existing entrance facilities are among the facilities that an incumbent LEC must lease for interconnection. According to the FCC, the *Triennial Review Remand Order* adopted a regulatory definition that reestablished that entrance facilities are part of an incumbent LEC's network. See ¶137; see also 47 CFR §51.319(e) (2005). The end of every entrance facility is therefore a "point within [an incumbent] carrier's network" at which a competing LEC could request interconnection, 47 U. S. C. §251(c)(2), and each entrance facility potentially provides a "technically feasible method of obtaining interconnection," 47 CFR §51.321(a) (2010).

3

Finally, the FCC contends that providing access to the
entrance facilities here for interconnection purposes is
technically feasible.  Under the Commission's regulations,
an incumbent LEC bears the burden of showing that a
requested method or point of interconnection is technically
infeasible.  See 47 CFR §§51.305(e), 51.321(d); see also
§§51.305(d), 51.321(c) (previously successful intercon-
nection is "substantial evidence" of technical feasibility).
AT&T does not dispute technical feasibility here.[4]

C

The FCC's interpretation is not "plainly erroneous or
inconsistent with the regulation[s]." *Auer, supra,* at 461
(internal quotation marks omitted).  First, we disagree
with AT&T's argument that entrance facilities are not a
part of incumbent LECs' networks.  Indeed, the Commis-
sion's view on this question is more than reasonable; it is
certainly not plainly erroneous.  The *Triennial Review
Remand Order* responded to the D. C. Circuit's decision
questioning the Commission's earlier finding that en-
trance facilities are not network elements.  It revised
the definition of dedicated transport—a type of network

---

[4] These cases concern only existing entrance facilities, and the Com-
mission expressly declines to address whether it reads its regulations to
require incumbent LECs to build new entrance facilities for intercon-
nection.  Brief for United States as *Amicus Curiae* 25, n. 7.  The Com-
mission suggests here, as it has before, that additional considerations of
cost or reasonableness might be appropriate if a competitive LEC were
to request that an incumbent LEC build new entrance facilities for
interconnection.  *Ibid.* (noting that the Commission's Wireline Competi-
tion Bureau has declined to require an incumbent LEC to bear the
entire cost of building new entrance facilities); see also *Local Competi-
tion Order* ¶553 (explaining with respect to meet-point arrangements
that "the parties and state commissions are in a better position than
the Commission to determine the appropriate distance that would
constitute the required reasonable accommodation of interconnection").
We express no view on the matter.

element—to include entrance facilities. *Triennial Review Remand Order* ¶¶136–137; see 47 CFR §51.319(e)(1) (defining dedicated transport to include "incumbent LEC transmission facilities . . . between wire centers or switches owned by incumbent LECs and switches owned by [competing] carriers"). Given that revised definition, it is perfectly sensible to conclude that entrance facilities are a part of incumbent LECs' networks.

Second, we are not persuaded by AT&T's argument that the Commission's views conflict with the definition of interconnection in §51.5. That regulation provides: "Interconnection is the linking of two networks for the mutual exchange of traffic. This term does not include the transport and termination of traffic." AT&T focuses on the definition's exclusion of "transport and termination of traffic." An entrance facility is a transport facility, AT&T argues, and it makes no sense to require an incumbent LEC to furnish a transport facility for interconnection when the definition of interconnection expressly excludes transport.

We think AT&T reads too much into the exclusion of "transport." The regulation cannot possibly mean that no transport can occur across an interconnection facility, as that would directly conflict with the statutory language. See §251(c)(2) (requiring "interconnection . . . for the transmission and routing of [local] telephone exchange service"). The very reason for interconnection is the "mutual exchange of traffic." 47 CFR §51.5; see also *Competitive Telecommunications Assn.* v. *FCC*, 117 F. 3d 1068, 1071–1072 (CA8 1997) ("[T]he transmission and routing of telephone exchange service" is "what the interconnection, the physical link, would be used for" (internal quotation marks omitted)).

The better reading of the regulation is that it merely reflects that the "transport and termination of traffic" is subject to different regulatory treatment than intercon-

nection.   Compensation for transport and termination—
that is, for delivering local telephone calls placed by
another carrier's customer—is governed by separate stat-
utory provisions and regulations.   See 47 U. S. C.
§§251(b)(5), 252(d)(2); 47 CFR §51.701.   The Commission
explains that a competitive LEC typically pays one fee for
interconnection—"just for having the link"—and then an
additional fee for the transport and termination of tele-
phone calls.   Tr. of Oral Arg. 28; see also Brief for United
States as *Amicus Curiae* 3, n. 1.   Entrance facilities, at
least when used for the mutual exchange of traffic, seem
to us to fall comfortably within the definition of intercon-
nection.   See 597 F. 3d, at 388 (Sutton, J., dissenting)
(noting that entrance facilities are "designed for the very
purpose of linking two carriers' networks" (internal quota-
tion marks omitted)).

In sum, the Commission's interpretation of its regula-
tions is neither plainly erroneous nor inconsistent with the
regulatory text.   Contrary to AT&T's assertion, there is no
danger that deferring to the Commission would effectively
"permit the agency, under the guise of interpreting a
regulation, to create *de facto* a new regulation."[5]   *Christen-
sen* v. *Harris County*, 529 U. S. 576, 588 (2000).

D

Nor is there any other "reason to suspect that the inter-
pretation does not reflect the agency's fair and considered
judgment on the matter in question."   *Auer*, 519 U. S., at
462.   We are not faced with a *post-hoc* rationalization by

———————

[5] There is no merit to AT&T's assertion that the FCC is improperly
amending the list of "[t]echnically feasible methods of obtaining inter-
connection" set forth in 47 CFR §51.321(b).   By its own terms, that list
is nonexhaustive.   See §51.321(b) ("[t]echnically feasible methods of
obtaining interconnection . . . include, but are not limited to" the listed
examples); see also §51.321(a) ("[A]n incumbent LEC shall provide . . .
*any* technically feasible method of obtaining interconnection" (emphasis
added)).

Commission counsel of agency action that is under judicial review. See *ibid.;* see also *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168–169 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; [*SEC* v.] *Chenery*[ *Corp.*, 332 U. S. 194 (1947),] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself"). And although the FCC concedes that it is advancing a novel interpretation of its longstanding interconnection regulations, novelty alone is not a reason to refuse deference. The Commission explains that the issue in these cases did not arise until recently—when it initially eliminated unbundled access to entrance facilities in the *Triennial Review Order*. Until then, the Commission says, a competitive LEC typically would elect to lease a cost-priced entrance facility under §251(c)(3) since entrance facilities leased under §251(c)(3) could be used for any purpose—*i.e.*, both interconnection and backhauling—but entrance facilities leased under §251(c)(2) can be used only for interconnection. We see no reason to doubt this explanation.

AT&T suggests that the Commission is attempting to require under §251(c)(2) what courts have prevented it from requiring under §251(c)(3) and what the Commission itself said was *not* required in the *Triennial Review Remand Order*. Tr. of Oral Arg. 50 ("[T]his is a rear guard effort to preserve [cost-based] pricing for things that the [C]ommission has said should no longer be available . . . at [such] pricing"). We do not think that AT&T is correct.

1

To begin with, AT&T's accusation does not square with the regulatory history. The Commission was not compelled to eliminate the obligation to lease unbundled entrance facilities at cost-based rates.

It is true that, prior to the *Triennial Review* orders, the

Commission twice unsuccessfully attempted to impose sweeping unbundling requirements on incumbent LECs. See *Local Competition Order* ¶278; *In re Implementation of Local Competition Provisions of the Telecommunications Act of 1996*, 15 FCC Rcd. 3696, 3771–3904, ¶¶162–464 (1999); see also 47 CFR §51.319 (1997); §51.319 (2000). Each time, the Commission's efforts were rejected for taking an unreasonably broad view of "impair[ment]" under §251(d)(2). See *Iowa Utilities Bd.*, 525 U. S*.,* at 392; *United States Telecom Assn.* v. *FCC*, 290 F. 3d 415, 421–428 (2002), cert. denied, 538 U. S. 940 (2003). In the *Triennial Review Order*, the Commission once again reinterpreted the "impair" standard and revised the list of network elements that incumbents must provide unbundled to competitors.

The Commission's initial decision to eliminate the obligation to unbundle entrance facilities, however, was not a result of the narrower view of impairment mandated by this Court and the D. C. Circuit. Instead, the Commission determined that entrance facilities need not be provided on an unbundled basis under §251(c)(3) on the novel ground that they are not network elements at all— something no court had ever suggested.

Moreover, since its initial decision to eliminate the unbundling obligation for entrance facilities, the Commission has been committed to that position. When the D. C. Circuit questioned the Commission's finding that entrance facilities are not network elements, the Commission responded by observing that the court "did not reject our conclusion that incumbent LECs need not unbundle entrance facilities, only the analysis through which we reached that conclusion." *Triennial Review Remand Order* ¶137. The Commission then found another way to support that same conclusion.

### 2

More importantly, AT&T's characterization of what the Commission has done, and is doing, is inaccurate. The *Triennial Review* orders eliminated incumbent LECs' obligation under §251(c)(3) to provide unbundled access to entrance facilities. But the FCC emphasized in both orders that it "d[id] not alter" the obligation on incumbent LECs under §251(c)(2) to provide facilities for interconnection purposes. *Triennial Review Order* ¶366; *Triennial Review Remand Order* ¶140. Because entrance facilities are used for backhauling and interconnection purposes, the FCC effectively eliminated only unbundled access to entrance facilities for backhauling purposes—a nuance it expressly noted in the first *Triennial Review* order. *Triennial Review Order* ¶365. That distinction is neither unusual nor ambiguous.[6] In these cases, the Commission is simply explaining the interconnection obligation that it left undisturbed in the *Triennial Review* orders. We see no conflict between the *Triennial Review* orders and the Commission's views expressed here.[7]

We are not concerned that the *Triennial Review Remand Order* did not expressly distinguish between back-

———————

[6] The Commission has long recognized that a single facility can be used for different functions and that its regulatory treatment can vary depending on its use. Unbundled network elements, for example, may not be used for the exclusive provision of mobile wireless or long-distance services. 47 CFR §51.309(b) (2010). Similarly, interconnection arrangements may be used for local telephone service but not for long-distance services. §51.305(b).

[7] The parties and their *amici* dispute whether an incumbent LEC has any way of knowing how a competitive LEC is using an entrance facility. This technical factual dispute simply underscores the appropriateness of deferring to the FCC. So long as the Commission is acting within the scope of its delegated authority and in accordance with prescribed procedures, it has greater expertise and stands in a better position than this Court to make the technical and policy judgments necessary to administer the complex regulatory program at issue here.

hauling and interconnection, though AT&T makes much of that fact. AT&T argues that the Commission's holding in the *Triennial Review Remand Order* is broader than that in the *Triennial Review Order*. In AT&T's view, the Commission concluded in the *Triennial Review Remand Order* that competitors are not impaired if they lack cost-based access to entrance facilities for backhauling *or* interconnection.

There are two flaws with AT&T's reasoning. First, as we have discussed, the *Triennial Review Remand Order* reinstated the ultimate conclusion of the *Triennial Review Order* and changed only "the analysis through which [it] reached that conclusion." *Triennial Review Remand Order* ¶137. Second, unlike §251(c)(3)'s unbundling obligation, §251(c)(2)'s interconnection obligation does not require the Commission to consider impairment. As the dissent below observed, it would be surprising indeed if the FCC had taken the novel step of incorporating impairment into interconnection without comment. 597 F. 3d, at 389 (opinion of Sutton, J.).

\*    \*    \*

The FCC as *amicus curiae* has advanced a reasonable interpretation of its regulations, and we defer to its views. The judgment of the United States Court of Appeals for the Sixth Circuit is reversed.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of these cases.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 10–313 and 10–329

————

TALK AMERICA, INC., PETITIONER
10–313                     *v.*
MICHIGAN BELL TELEPHONE COMPANY
DBA AT&T MICHIGAN


ORJIAKOR ISIOGU, ET AL., PETITIONERS
10–329                     *v.*
MICHIGAN BELL TELEPHONE COMPANY
DBA AT&T MICHIGAN

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 9, 2011]

JUSTICE SCALIA, concurring.

I join the opinion of the Court.  I would reach the same
result even without benefit of the rule that we will defer to
an agency's interpretation of its own regulations, a rule in
recent years attributed to our opinion in *Auer* v. *Robbins*,
519 U. S. 452, 461 (1997), though it first appeared in our
jurisprudence more than half a century earlier, see *Bowles*
v. *Seminole Rock & Sand Co.*, 325 U. S. 410 (1945).  In
this suit I have no need to rely on *Auer* deference, because
I believe the FCC's interpretation is the fairest reading of
the orders in question.  Most cogently, ¶140 of the *Trien-
nial Review Remand Order* serves no purpose unless one
accepts (as AT&T does not) the distinction between back-
hauling and interconnection that is referred to in footnotes
to ¶¶138 and 141 of the order.  20 FCC Rcd. 2533, 2610–
2612 (2005).  The order would have been clearer, to be
sure, if the distinction had been made in a footnote to ¶140

itself, but the distinction is there, and without it ¶140 has
no point.

It is comforting to know that I would reach the Court's
result even without *Auer.* For while I have in the past
uncritically accepted that rule, I have become increasingly
doubtful of its validity. On the surface, it seems to be a
natural corollary—indeed, an *a fortiori* application—of the
rule that we will defer to an agency's interpretation of the
statute it is charged with implementing, see *Chevron
U. S. A.* v. *Natural Resources Defense Council, Inc.*, 467
U. S. 837 (1984). But it is not. When Congress enacts an
imprecise statute that it commits to the implementation of
an executive agency, it has no control over that implemen-
tation (except, of course, through further, more precise,
legislation). The legislative and executive functions are
not combined. But when an agency promulgates an im-
precise rule, it leaves *to itself* the implementation of that
rule, and thus the initial determination of the rule's mean-
ing. And though the adoption of a rule is an exercise of
the executive rather than the legislative power, a properly
adopted rule has fully the effect of law. It seems contrary
to fundamental principles of separation of powers to per-
mit the person who promulgates a law to interpret it as
well. "When the legislative and executive powers are
united in the same person, or in the same body of magis-
trates, there can be no liberty; because apprehensions may
arise, lest the same monarch or senate should enact ty-
rannical laws, to execute them in a tyrannical manner."
Montesquieu, Spirit of the Laws bk. XI, ch. 6, pp. 151–152
(O. Piest ed., T. Nugent transl. 1949).

Deferring to an agency's interpretation of a statute does
not encourage Congress, out of a desire to expand its
power, to enact vague statutes; the vagueness effectively
cedes power to the Executive. By contrast, deferring to an
agency's interpretation of its own rule encourages the
agency to enact vague rules which give it the power, in

future adjudications, to do what it pleases. This frustrates the notice and predictability purposes of rulemaking, and promotes arbitrary government. The seeming inappropriateness of *Auer* deference is especially evident in cases such as these, involving an agency that has repeatedly been rebuked in its attempts to expand the statute beyond its text, and has repeatedly sought new means to the same ends.

There are undoubted advantages to *Auer* deference. It makes the job of a reviewing court much easier, and since it usually produces affirmance of the agency's view without conflict in the Circuits, it imparts (once the agency has spoken to clarify the regulation) certainty and predictability to the administrative process. The defects of *Auer* deference, and the alternatives to it, are fully explored in Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612 (1996). We have not been asked to reconsider *Auer* in the present case. When we are, I will be receptive to doing so.